IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LIA X. XIONG,

                    Plaintiff,                          CV-06-1775-ST

        v.                                    FINDINGS AND
                                                     RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Lia X. Xiong ("Xiong"), brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for supplemental security income under Title XVI of the Social Security Act ("Act"). The court has jurisdiction under 42 USC § 405 (g). For the reasons set forth below, the Commissioner's decision should be reversed and the case remanded for a calculation of benefits pursuant to Sentence Four of 42 USC § 405(g).

1 - FINDINGS AND RECOMMENDATION

///

## **BACKGROUND**

Xiong is a 56 year old man who immigrated to the US from Laos in 1980.  Tr. 163.  He is married and has eleven children, some of whom are minors still living at home.  Tr. 228.  He and his family originally lived in California where he became a naturalized citizen in 1996.  Tr. 87A.  In Laos, Xiong worked as a farmer, farming corn and rice.  Tr. 269.   He has no education and is illiterate, having never learned to read in English, or in his native tongue, Hmong.  *Id*.  He does not speak English and has consistently communicated through an interpreter, usually a member of his immediate family.

Xiong claims disability mainly due to pain in his lower back.  Xiong first injured his back in 1983 while working on a California dairy farm.  Tr. 233, 247, 265.  His first struggles with disability appear from the record to be several periods of temporary disability in the late 80's and early 90's.  Tr. 13-14, 204-213.  The reasons given for his disability include, variously, back pain, headaches, neurosis, anxiety and depression.  *Id*.

Xiong and his family moved to Oregon in 1996 where Xiong obtained employment as a assembler at a furniture company and later a luggage company.  Tr. 104, 106-07, 144.  This employment ended in June 1998 or 1999.  *Id*.  Xiong went back to work as a janitor in December 2000, but quit after less than two months when he injured his back lifting a 50-pound bag of recyclables.  Tr. 247, 265.   Beginning in January 2001, Xiong sought medical treatment for his back injury.  Xiong again injured his back in 1992 while digging a hole in the ground.  Tr. 233, 247, 265.

///

2 - FINDINGS AND RECOMMENDATION

///

## ADMINISTRATIVE HISTORY

Xiong filed an application for disability benefits on April 21, 2003, with an alleged onset date of January 1, 2002.  Tr. 11, 87D-G.  He alleged disability due to facial paralysis, lumbosacral disc disease, Bell's palsy, anxiety, depression, headaches, and back pain.  Tr. 89.[1] His claim was denied initially on July 3, 2003, and upon reconsideration on December 16, 2003. Tr. 26-30, 33-35.   He attended a hearing on May 15, 2006, before an ALJ who denied his application by an opinion dated June 15, 2006.  Tr. 11-20.  The Appeals Council denied Xiong's request for review on October 13, 2006, making the ALJ's decision the Commissioner's final decision subject to judicial review.  Tr. 4-6; 20 CFR §§ 404.981, 416.1481, 422.210.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995) (citation omitted), *cert denied,* 517 US 1122 (1996).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A). The claimant's mental or physical impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

---

[1]  At the hearing before the ALJ and in submissions to this court, Xiong has made it clear that his only current disability is lumbrosacral disc disease and back pain.  Although he apparently received disability benefits in the past for the others, the record contains no evidence of any current disability due to palsy, anxiety, depression or headaches.  Therefore, as did the ALJ, this court will only consider the disability due to lumbrosacral disc disease and back pain.

experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 USC § 423(d)(2)(A).

In this case, Xiong must prove that he was disabled during the period beginning in the month he filed for disability benefits, April 2003, through the date of the ALJ's decision, June 15, 2006.  Evidence of a disability prior to this date is only relevant insofar as it sheds light on whether Xiong was disabled during this 38-month time frame.

The Commissioner has established a five-step sequential process for determining whether a person is disabled with the meaning of the Social Security Act.  *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 416.920.  The claimant has the burden of proof on the first four steps. *Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999).

First, the Commissioner determines whether the claimant is engaged in substantial gainful activity.  20 CFR § 416.920(b).  If not, then at step two, the Commissioner must determine whether the claimant's impairment is "severe" within the meaning of the Act.  20 CFR § 416.920(c).  If the impairment is "severe," the Commissioner must next determine at step three whether it is a "listed impairment."  20 CFR § 416.920(d); 20 CFR Pt. 404, Subpt. P, App. 1 ("Listing of Impairments").  If the impairment equals a listed impairment, then the claimant is found disabled.  *Id.*

If the impairment, even though "severe," does not equal a listed impairment, then the analysis proceeds to an intermediary step to determine the claimant's residual functional capacity ("RFC").  20 CFR §§ 416.920(e).  The RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments.  20 CFR § 416.945(a); SSR 96-8p.  Based on the RFC,  the

Commissioner then proceeds to step four to determine whether the claimant retains the capacity to perform his or her past relevant work, defined as work the claimant has performed in the past 15 years.  20 CFR §§ 416.920(f), 416.965.  If the claimant can perform past relevant work, then he or she is not disabled.

Should the claimant be unable to perform his or her past relevant work, then the analysis proceeds to step five, where the Commissioner bears the burden of proving that the claimant can perform a significant number of other jobs in the national economy.  20 CFR § 416.920(g); *Tackett*, 180 F3d at 1099.  If the Commissioner cannot meet this burden, then the claimant is declared disabled.  *Id.*

### ALJ'S DECISION

At steps one and two, the ALJ found that Xiong was not engaged in substantial gainful activity and suffered from lumbrosacral disc disease, a severe impairment.  Tr. 13-14.  At step three, the ALJ found that Xiong did not have an impairment or combination of impairments that met or equaled a listed impairment.  Tr. 14.

The ALJ then found Xiong "not entirely credible" regarding his alleged limitations upon his ability to work.  Tr. 14.  As a result, the ALJ found that Xiong had the RFC to perform light exertion work, involving occasionally lifting or carrying objects weighing up to 20 pounds, and frequently 10 pounds.  *Id.*  He found that Xiong was able to sit, stand and walk six hours in an eight-hour workday and that his abilities to push and pull are commensurate with light exertion work.  *Id.*  Finally, he found that Xiong was limited to occasionally stooping and crouching.  *Id.*

Based upon this RFC, the ALJ determined at step four that Xiong was capable of performing his past relevant work as a furniture assembler and suitcase assembler.  Tr. 19.

Therefore, the ALJ determined that Xiong was not under a disability as defined in the Social Security Act at any time through the date of his decision.  Tr. 20.

## STANDARDS

The district court must affirm the Commissioner's denial benefits if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC 405(g); *Smolen v. Chater*, 80 F3d 1273, 1279 (9th Cir 1996).  Substantial evidence is more than a scintilla but less than a preponderance, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995) (citation omitted).

This standard requires the district court to uphold the Commissioner's findings if supported by inferences reasonably drawn from the record.  *Gallant v. Heckler*, 753 F2d 1450, 1453 (9th Cir 1984).  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision, but if the evidence supports more than one rational interpretation, the court must defer to, and may not substitute its judgment for, that of the Commissioner.  *Flaten v. Sec'y of Health & Human Servs.*, 44 F3d 1453, 1457 (9th Cir 1995) (citations omitted).

## FINDINGS

Xiong asserts that the ALJ committed legal error by rejecting the opinion of his treating and examining physicians and discrediting his testimony.  Properly credited, Xiong argues that the evidence precludes the performance of past relevant work and compels a finding of disability

at step five.  For the reasons stated below, this court finds that the ALJ's decision is not

supported by substantial evidence in the record.

///

///

## I.    <u>Medical Sources</u>

The treating and examining physicians rendered opinions that Xiong was not able to

work full-time due to his lumbarsacral disc disease.  The ALJ rejected those opinions in favor of

contrary opinions by non-examining physicians (Linda Jensen, M.D., and Sharon Eder, M.D.)

that Xiong could do light work.  Tr. 17.  This conclusion is primarily based on objective

evidence revealing only "mild" findings and "very conservative" treatment to which Xiong "has

responded well."  *Id*.

### A.    <u>Treating Physician</u>

#### 1.    <u>History of Treatment</u>

Deborah A. Satterfield, M.D., first saw Xiong on November 2, 2000 when Xiong came in

to discuss his ongoing difficulties with back pain.  Tr. 224.  Xiong showed Dr. Satterfield

multiple records from physicians who had treated him in California, and he indicated that he was

unable to work.  Satterfield gave Xiong an excuse from work and prescribed Tylenol with

codeine.  *Id.*

Dr. Satterfield saw Xiong for back pain multiple times in 2001.  Shortly after he injured

his back working as a janitor in early January 2001, she gave Xiong a work pass, stating he

would be able to return to work on April 1, 2001.  Tr. 223.  She saw Xiong again on April 6,

2001 and noted he was still suffering pain due to his "acute back strain on top of chronic back

pain." Tr. 164.  A month later she observed marked spasm and limitation in forward and lateral

bending and refilled his medication.  Tr. 163.  In October, 2001, Xiong returned with a

"resumption of his back pain" and asked for a refill of his medication.  Tr. 168.  She noted a

"decreased range of motion" in his back, diagnosed chronic headaches and back pain, refilled his

medication and set his next appointment in six months.  *Id*.

On March 1, 2002. Dr. Satterfield reported that Xiong "continues to have severe back

pain," but that "has been taking Tylenol with codeine with good results."  Tr. 167.  Her

examination revealed a "decreased range of motion" in his back and positive straight leg raising.

*Id*.  After noting a prior diagnosis of a lumbar disc, she assessed him with "[l]umbar disc

syndrome with chronic pain easily managed with Tylenol with codeine in terms of pain relief."

*Id*.

In June 2002, Dr. Satterfield's examination again revealed a decreased range of motion.

Tr. 160.   She noted "[s]traight leg raising is positive on the left at 15 degrees, negative on the

right.  Deep tendon reflexes are 2+.  The patient is able to heel-toe walk."  *Id*.  Again, she

assessed lumbar radiculopathy[2] and recommended pain control with Tylenol with codeine,

stretching, and regular exercise.  *Id*.

At his next appointment on December 16, 2002, Xiong complained of pain in his left

arm.  Tr. 166.  He was unable to carry anything and had some numbness and tingling from his

neck to his thumb.  *Id*.  He complained that "welfare" was trying to make him go back to work,

---

[2]  The Attorneys' Dictionary of Medicine gives the following definition for radiculopathy:

> radiculopathy (ra-dik"a-lop'a-thi). Any disease or abnormality of a dorsal or ventral (sensory or
> motor) spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the
> point where it joins its companion root (a motor or a sensory) to form a spinal nerve. 5-R
> Attorneys' Dictionary of Medicine, 218 (2005).

but that "the combination of his severe back pain and his left arm pain is making it almost

impossible for him to think about doing anything." *Id.* He reported he had "difficulty

performing his IADLs [instrumental activities of daily living] at home without assistance from

his family members because he is not able to use his left arm and his back hurts if he lifts

anything over five pounds." *Id.* Upon examination, Dr. Satterfield found his neck had full range

of motion with "some spasm over the left upper trapezius" and full range of motion in his left

arm with no noted physiological abnormalities. *Id.* She assessed "[l]umbrosacral disc disease by

known diagnosis, now patient probably has cervical arthritis causing mild cervical

radiculopathy." *Id.* She took him off work permanently, commenting:

> Given fact that Mr. Xiong is 52 years old, speaks not a word of English
> and is only suited for manual labor, I cannot see how he is ever going to
> be able to return to any form of gainful employment [*sic*]. He is given a
> letter to this effect. He is also given a refill on his Tylenol with codeine.
> As he is not having any evidence of muscle weakness, I don't think there
> is any indication for doing further evaluation of his neck problems at this
> time.

*Id.*

Dr. Satterfield saw Xiong twice in 2003 for back treatment. Tr. 149, 165. On only one

of these occasions is there a record of his receiving a refill for his pain medication. Tr. 149.

Xiong did not see Dr. Satterfield again until over a year later on December 1, 2004, when

he complained again of ongoing arm and back pain which had been "somewhat worse recently ."

Tr. 220. Her examination revealed some tenderness in his left shoulder with decreased range of

motion over the bursa and decreased range of motion in his back. *Id.* Xiong declined a steroid

injection. *Id.* Dr. Satterfield referred him back to Dr. Wang for further evaluation, ordered an x-

ray of his shoulder, and prescribed an extra-sized refill of Tylenol with codeine. *Id.* Dr. Wang's

evaluation is not in the record, and the shoulder x-ray showed nothing out of the ordinary.
Tr. 221.

Dr. Satterfield's final appointment with Xiong in the record occurred on May 24, 2005.
Tr. 214.  Xiong reported ongoing left arm pain that had recently grown worse.  *Id*.  The pain was
worse in his shoulder and when he moved.  *Id*.  He also reported dull back pain which did not
radiate.  *Id*.  The examination revealed Xiong's condition to be much the same as in December
2004, namely tenderness and decreased range of motion over the bursa, and decreased range of
motion in his back.  *Id*.  He again declined a steroid injection.  *Id*.  Dr. Satterfield noted that
Xiong "really wants pain relief at this [time]" and was taking NSAIDS (non-steroidal
anti-inflammatory drugs) chronically.  *Id*.

### 2.    Legal Standard

"The opinions of treating doctors should be given more weight than the opinions of
doctors who do not treat the claimant."  *Reddick v. Chater*, 157 F3d 715, 725 (9th Cir 1998),
citing *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  This is "[b]ecause treating physicians are
employed to cure and thus have a greater opportunity to know and observe the patient as an
individual . . . ."  *Smolen*, 80 F3d at 1285 (citations omitted).  Therefore, "[a] treating physician's
medical opinion as to the nature and severity of an individual's impairment must be given
controlling weight if that opinion is well-supported and not inconsistent with the other
substantial evidence in the case record."  *Edlund v. Massanari*, 253 F3d 1152, 1157 (9th Cir
2001), citing SSR 96-2p.  Where the treating doctor's opinions is not contradicted by another
doctor, it may be rejected only for "clear and convincing" reasons supported by substantial
evidence in the record.  *Lester*, 81 F3d at 830, quoting *Baxter v. Sullivan*, 923 F2d 1391, 1396

(9th Cir 1991).  "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for doing so."  *Id*, quoting *Murray v. Heckler*, 722 F2d 499, 502 (9th Cir 1983).  This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002), citing *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir 1989).  "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  *Reddick*, 157 F3d at 725, citing *Embrey v. Bowen*, 849 F2d 418, 421-22 (9th Cir 1988).

However, even when not controlling, the ALJ must still give the treating source medical opinion some measure of deference to be weighed by a number of factors listed in the regulations including:  (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization.  20 CFR § 416.927(d)(2).  But "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory and inadequately supported by clinical findings."  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005), citing *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001).

A treating physician may offer an opinion on the ultimate issue of disability and even though "the administrative law judge is not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability, . . . he cannot reject them without presenting clear and convincing reasons for doing so."  *Reddick*, 157 F3d at 725, quoting *Matthews v. Shalala*, 10 F3d 678, 680 (9th Cir 1993).

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F3d at 831 (emphasis in original) (citations omitted).  When looking for substantial evidence to reject a treating source's opinion, "reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion." *Id* at 831 n8.

> 3.    **Analysis**

The ALJ gave no weight to Dr. Satterfield's December 2002 opinion that Xiong could not work.  Tr. 16-17.   He first explained that it "did not include findings on examination or the use of medically acceptable diagnostic techniques in support of this opinion."   Tr. 16.  The ALJ appears to be relying on the rule that he "need not accept the opinion of a doctor if that opinion is brief, conclusory and inadequately supported by clinical findings." *Bayliss*, 427 F3d at 1216. However, Dr. Satterfield reviewed Xiong's records prior to 2001, noting the lumbar disc disease diagnosis, and examined Xiong on multiple occasions, noting a reduced range of motion.  She may not have described her physical examinations or the results in any great detail, but she did record objective data on two occasions.  Tr. 160-61.  Range of motions examinations, palpation for pain, and clinical observations of a patient's gait and movement are all medically acceptable diagnostic techniques.  *See* 20 CFR Pt. 404, Subpt. P, App. 1, § 1.00(C)-(E).  Furthermore, as discussed below, the ALJ erred in finding Xiong to be less than credible.  Therefore, Dr. Ellison properly relied upon Xiong's subjective complaints in forming his conclusions.

12 - FINDINGS AND RECOMMENDATION

The ALJ also explained that Dr. Satterfield's opinion expressed only "vocational rather than medical factors" as limiting his ability to work (Xiong was 52, didn't speak English, only suited for manual labor). Tr. 17. However, the notation that Xiong was "only suited for manual labor" must be read in light of the fact that Dr. Satterfield had been treating Xiong for back pain for over two years. Properly read, Dr. Satterfield's note supports the unexceptional proposition that a person who is only suited for manual labor and who suffers from severe chronic back pain is unlikely to "return to any form of gainful employment."

The ALJ quibbled with Dr. Satterfield's finding that Xiong could only perform manual labor "because of his inability to speak English." *Id*. The ALJ noted that Xiong had "been gainfully employed in the United States from 1997 through 1999" which to him "suggests that he has some English skills, albeit limited that allow him to work." *Id*. The ALJ's reasoning is confusing at best. There is no indication in the record that Xiong has ever conducted any type of work besides unskilled manual labor. The record contains no evidence that Xiong speaks any English. To the contrary, every time Xiong saw Dr. Satterfield, he brought an interpreter. Even if Xiong speaks a little English, this fact does not suggest that he can perform work other than manual labor. The two are unrelated, and the ALJ erred in attempting to use this logically deficient reasoning to attack Dr. Satterfield's opinion.

Thus, the ALJ failed to provide the requisite specific and legitimate reasons to reject Dr. Satterfield's December 2002 opinion.

   **B.**    **Examining Physicians**

Generally, the opinion of an examining physician is given more weight than the opinion of a nonexamining physician. *Andrews*, 53 F3d at 1041; *Lester*, 81 F3d at 830-31. However "when it is an examining physician's opinion that the ALJ has rejected in reliance on the testimony of a nonexamining advisor, reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews*, 53 F3d at 1041. But when an ALJ rejects an examining physician's testimony in favor of a nonexamining nontreating physician, he must still give specific, legitimate reasons supported by substantial evidence in the record. *Id* at 1043; *Lester*, 81 F3d at 830-31.

### 1. **Dr. Ellison**

At the request of the Social Security Administration ("SSA"), John H. Ellison, M.D., gave Xiong a comprehensive 65 minute orthopedic exam on May 28, 2005. Tr. 191. He also reviewed the records of Providence Family Medicine and Dr. Satterfield and reviewed the assessment by the two non-examining physicians. *Id*. Xiong reported to Dr. Ellison that he has sharp pain in the low back that radiates into his right leg and is aggravated by walking. *Id*. He reported the pain has been steady for the past year. *Id*. He also complained of weakness but not numbness in his right leg and reported that he had been using a cane for about six months and had fallen down twice. *Id*. He also reported that his wife helped him dress and undress and "do just about everything else," and that his pain disturbed his sleep "a great deal." *Id*.

Dr. Ellison found that Xiong had marked limitation in the range of motion for his dorsolumbar spine (flexion limited to 30° out of 90°; extension 0° out of 30°; lateral 20° in both

directions out of 30°).  Tr. 193.  He also noted that his straight leg raising while supine was

positive and worse on the right, even when sitting.  *Id.*  Xiong could not walk on his toes due to

painful great toes and could not feel a pinprick or light touch in his right leg and arm.  *Id.*  Dr.

Ellison recorded variable strength in Xiong's legs "with give-way phenomenon."  *Id.*  As a

result, he made The following assessment and diagnoses:

> 1.    Chronic lumbar pain with radiation into the right leg, but the
>       apparent sensory abnormalities and inconsistent leg weakness are
>       hard to evaluate; needs an MRI scan of the lumbosacral spine.
> 2.    Idiopathic partial facial paralysis with involvement of all three
>       divisions of the seventh cranial nerve on both sides
>                                   * * *
> 6.    Possible gout, both great toes

*Id*.

He also gave the following estimated work related activities:

> STANDING, WALKING, SITTING: all limited to about five minutes by
> pain in low back and right leg, *according to claimant, but credibility
> questionable*.
> LIFTING AND CARRYING: not able to carry a "gallon of water"
> HEARING AND SPEAKING: speaks only Hmong
> HANDLING OBJECTS: not limited
> TRAVELING: requires change in position frequently

*Id* (emphasis added).

Dr. Ellison also completed a Medical Source Statement of Ability to Do Work-Related

Activities form.  Tr. 198-201.  As exertional limitations, Dr. Ellison reported that Xiong could

occasionally lift less than 10 pounds and that standing and walking were limited to "less than 2

hours in an 8-hour workday."  Tr. 198.  Dr. Ellison also reported that Xiong's sitting, pushing

and pulling were affected by his impairment, but did not indicate to what extent.  Tr. 199.  As

15 - FINDINGS AND RECOMMENDATION

findings supporting these conclusions, he wrote: "Findings are inconsistent but I am unable to discount his claims [regarding] the above severe limitations without further study, *i.e.* MRI of lumbar and perhaps cervical spine." *Id.* As postural limitations, Dr. Ellison stated that Xiong could only occasionally kneel, crouch, crawl or stoop, but that he could never climb. *Id.* According to the form "occasionally" means "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous). Tr. 198. Finally, Dr. Ellison reported Xiong's only visual and communicative limitations was "trouble with some sounds because of facial paresis." Tr. 200.

Four months later, Xiong obtained an MRI which found possible mild degeneration in his L5-S1 disc. Tr. 225. The MRI showed minimal posterior disc bulging in this disc, but otherwise disc bulging, herniation, narrowing, nerve root impingement or spinal stenosis at any level. *Id.* The "impressions" listed were "[n]o nerve root impingement or spinal stenosis at any level," and "[v]ery mild degenerative disc changes and posterior disc bulging at L5-S1, which was present on the previous exam." *Id.*

The ALJ gave no weight to Dr. Ellison's assessment because it was "based on the claimant's subjective allegations" providing "no adequate basis in support of the degree of limitation alleged by the claimant." Tr. 19. The ALJ pointed out that even though Xiong's test indicated certain limitations, Ellison found Xiong's "credibility questionable." *Id.* He also noted a conflict between Dr. Ellison's examination which found leg raise to be worse on the right side, and Dr. Satterfield's examination which found straight leg raising positive only on the left and negative on the right. *Id.* Finally, the ALJ noted that Dr. Ellison stated his findings

were "inconsistent" and that he was "unable to discount [Xiong's] claims . . . without further

study." *Id*.

None of these reasons is supported by the record.  First, Dr. Ellison's findings on

examination are consistent with those made on several occasions by Dr. Satterfield.  Tr. 160,

163, 166, 167, 214, 224.  The only inconsistency in the record is the difference in their

evaluation of Xiong's straight leg lifting.  In June 2002, Dr. Satterfield noted positive straight leg

lifting on the left and none on the right, but Dr. Ellison noted straight leg lifting to be positive in

*both* legs, and worse on the right.  There is no explanation in the record for the deterioration of

the condition in Xiong's right leg at a pace faster than the left over the two-and-a-half year

period between their respective examinations.  However, the two observations are not

necessarily inconsistent as Dr. Ellison also found straight leg lifting positive in the left leg, as

noted by Dr. Satterfield.

Furthermore, Dr. Ellison provided no explanation for doubting Xiong's credibility.

There is no evidence that Xiong did not give his full effort at the examination or that he

attempted to fake any injuries to skew Dr. Ellison's results.  *See Thomas*, 278 F3d at 959

(claimant properly discredited, in part, because she "failed to give maximum or consistent effort

during two physical capacity evaluations"); *Tonapetyan*, 242 F3d at 1148 (claimant properly

discredited, in part, because of "her lack of cooperation during consultative examinations").

Being "unable to discount" Xiong's reports "without further study" could just as easily be

interpreted as suggesting that Dr. Ellison was trying to discount Xiong's complaints and,

therefore, his examination was viewed through a jaundiced eye.  As discussed below, there is no

evidence in this case that Xiong is malingering or has exaggerated his symptoms. Therefore, Dr. Ellison's unexplained comment ("credibility questionable") is, at best, weak evidence to reject his conclusions.

Moreover, the 2005 MRI does not contradict Dr. Ellison's findings or support his doubts about Xiong's credibility. Dr. Ellison was never recontacted and asked whether the results of the MRI supported, contradicted or were irrelevant to his examination. The ALJ could have asked Dr. Ellison to provide a follow-up examination or supplement his report based upon the later MRI, but chose not to. Therefore, the ALJ cannot speculate on the effect, if any, this MRI would have had on Dr. Ellison's opinion

Finally, as discussed below, the ALJ erred in finding Xiong to be less than credible. Therefore, Dr. Ellison properly relied upon Xiong's subjective complaints in forming his conclusions. Although the physical examination given by Dr. Ellison produced, in his words, "inconsistent" results, he never indicates what results were inconsistent. Instead, after thorough physical examination of Xiong, Dr. Ellison was "unable to discount his claims" and filled out a form indicating limitations which were consistent with Dr. Satterfield's observations, as well as the testimony of Xiong and his son, Chen.

Thus, the ALJ failed to give specific and legitimate reasons for rejecting the opinion of Dr. Ellison.

### 2.    Dr. Dover

At the request of Xiong's attorney, Eric Dover, M.D., conducted a records review and examined Xiong on December 6, 2005. Tr. 254-55. Xiong reported pain in his lumbosacral

area, rating it at a constant 7-8/10 severity, and burning pain, numbness and tingling in the lateral

thigh regions. Tr. 254. He said that he can walk, stand and sit for about 30 minutes before the

pain becomes severe and that he spends a lot of time lying flat. *Id*. He reported being unable to

do any household chores, but could bathe and feed himself. *Id*.

On examination, Dr. Dover noted that Xiong walked slowly and stiffly, relying upon a

cane for support to stand and ambulate. *Id*. He found moderate spasms and tenderness in the

lumbar areas of his back, bilaterally. Tr. 255. He rated flexion at 20° degrees and his extension

at 1°, found him very unstable, and noted a partial deficit in the 7th cranial nerve. *Id*. Xiong was

unable to do a Romberg test secondary to instability of standing without his cane. *Id*.

Dr. Dover assessed Xiong with "1. Chronic back pain secondary to lumbar spasm and

deconditioning, 2. Deconditioning of muscular system, and 3. Right Bell's Palsy." *Id*. He noted

that Xiong's most recent MRI revealed little in regards to abnormalities that would account for

his significant discomfort. Nevertheless, he found that Xiong has "developed severe

deconditioning over the past 4-5 years." *Id*. After discussing the process of deconditioning, he

stated that:

> At this time, Mr. Xiong is unable to do work of any type. His pain and
> deconditioning are too severe. He is unable to stand, walk or sit for any
> significant length of time. He is incapable of doing anything except the
> most minimal bending, lifting less than a few pounds and could injure
> himself easily in any unstable environment. He would benefit from
> rehabilitation, but has no access to this treatment modality. Even with
> treatment it would be unlikely that he would improve that markedly in a
> short period of time to be capable of returning to work any time soon. He
> has no English language or specific labor skills.

*Id*.

19 - FINDINGS AND RECOMMENDATION

The ALJ gave no weight to Dr. Dover's opinion, finding that the limitations reported by Xiong were "not adequately sustained." Tr. 17-18. The ALJ noted that the "findings based on the use of medically acceptable diagnostic techniques have been mild," conflicting with Dr. Dover's opinion of severe deconditioning. Tr. 18. He believed that Dr. Dover "appears to be attempting to advocate for the claimant's disability without having adequate objective findings to support his statements." *Id*.

The opinion of Dr. Dover does go beyond the other medical opinions in terms of the severity and intensity of Xiong's limitations. However, in many ways, Dr. Dover's physical examination is closely in line with Dr. Ellison's. Both noted limited range of movement in the lumbar region. Both noted limitations in the length of time Xiong could stand, sit and walk. Although the medical record is limited, nothing in it contradicts Dr. Dover's description of Xiong's deconditioning. After all, Xiong has not worked since 2002 and has done very little physical activity since then which likely would result in deconditioning. Therefore, the ALJ failed to give specific and legitimate reasons for assigning Dr. Dover's opinion no weight.

## II.    **Credibility of Xiong's Subjective Pain Testimony**

### A.    **Xiong's Testimony**

Xiong's Pain Questionnaire dated May 2003 reports that the pain in his lower back is "stinging." Tr. 101. He suffers from this pain "mostly everyday" which lasts three to four hours at a time and is caused by lifting, bending, standing and walking. *Id*. Sitting and resting provide relief. *Id*. His pain permits him to be up for only one or two hours before he is required to take a rest and has stopped him from performing activities he used to enjoy like gardening, fishing

and hunting.  Tr. 102.  He does no chores around the house and requires assistance with lifting

and carrying things.  Tr. 103.

At the hearing on May 15, 2006, Xiong testified that he feels pain in his lower back all

the time, which only feels better when he is on medication.  Tr. 263-64.  He rated his pain as an

eight to nine on a scale of ten without medication and a seven with medication.  Tr. 264.  To deal

with his pain, he stated he switches positions, sits, lies down, and walks, but generally could not

be in any one position for more than 30 minutes.  Tr. 264-65.  He reported using cane since 2001

to help him stand up for longer periods of time and prevent falling.  Tr. 265-66.

He further testified that he could not lift anything heavier than a gallon of milk which he

could carry for only a short period of time.  Tr. 266.  He reported problems bending, stooping,

crouching and squatting and  said he could not climb a flight of stairs.  Tr. 267.  He testified that

he did no chores because they aggravated his pain and made him feel as if he would fall down.

Tr. 267-68.

### B.    ALJ's Decision

The ALJ found that "[Xiong's] medically determinable impairments could reasonably be

expected to produce The alleged symptoms," but that "his statements concerning The intensity,

duration and limiting effects of these symptoms are not entirely credible."  Tr. 14.  This

determination was based on The "[o]bjective medical evidence and other factors," but The ALJ

did not specifically list those factors.  Based on Xiong's lack of credibility, The ALJ not only

discounted Xiong's subjective statements regarding his limitations, but also rejected The

opinions of treating and examining doctors who had relied significantly on Xiong's subjective statements to reach their conclusion.

**C.**     **Legal Standard**

"[O]nce The claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*, 947 F2d 341, 345 (9th Cir 1991) (*en banc*), citing *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir 1986). This is because the experience of pain is highly idiosyncratic, and subjective symptoms may exist in greater degrees than is provable through objective medical evidence alone. *Johnson v. Shalala*, 60 F3d 1428, 1433 (9th Cir 1995).

If an ALJ rejects a claimant's subjective complaints, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaint." *Lester*, 81 F3d at 834 (citations omitted). These findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F3d at 958, citing *Bunnell*, 947 F2d at 345-46.

In making credibility findings, the ALJ may consider the claimant's treatment history and observations of physicians regarding symptoms. *Smolen*, 80 F3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and observations of third parties with personal knowledge of the claimant's functional limitations. *Id*. Additionally, the ALJ may employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id*.

**D.**     **Analysis**

As discussed above, Xiong provided objective medical evidence from three separate medical sources that he suffered from lumbrosacral disc disease and chronic lower back pain that reasonably could cause him the degree of pain he reported.  Tr. 160, 167 (Dr. Satterfield), Tr. 193 (Dr. Ellison), Tr. 255 (Dr. Dover).  Therefore, the ALJ must provide clear and convincing reasons for rejecting Xiong's subjective pain testimony.  As discussed below, The ALJ's reasons are not supported by the record.

**1.**     **Objective Medical Evidence**

The ALJ primarily rejected Xiong's pain testimony due to the lack of corroborating objective findings based upon medically acceptable examination techniques and his doctors' heavy reliance upon Xiong's subjective complaints.  Xiong received two MRIs and one CT scan. Tr. 225, 252-53.  Only one of these occurred during the relevant time period and showed "mild" signs of degeneration in one disc, but no "abnormalities."  Tr. 225.  The earlier exams also revealed nothing abnormal in the condition of Xiong's lumbar region.

Xiong also received physical examinations on multiple occasions by multiple doctors, each of whom confirmed that Xiong suffered from a debilitating condition in his lower back. Tr. 148-52, 214-24 (Dr. Satterfield); Tr. 191-201 (Dr. Ellison); Tr. 254-55 (Dr. Dover).  These examinations, which included range of motion examinations, palpation for pain and clinical observations of gait and movement, generally concluded that Xiong is in some degree of pain. However, each of these examinations is heavily dependent upon observations within Xiong's control.  To the extent that Xiong's credibility is undermined, these examinations are also

undermined.  *Tonapetyan*, 242 F3d at 1149 (ALJ did not err by rejecting the opinion of a treating

physician who relied only on claimant's subjective complaints and on testing within the

claimants control).

While "lack of medical evidence cannot form the sole basis for discounting pain

testimony, it is a factor that the ALJ can consider in his credibility analysis."  *Burch v. Barnhart*,

400 F3d 676, 681 (9th Cir 2005).  Therefore, this reason alone does not provide a clear and

convincing reason to discount Xiong's credibility.

### 2.    Limited Treatment History

The ALJ also noted that, despite extensive treatment records with Dr. Satterfield from

2000 through 2005, Xiong's treatment was "very conservative as well as infrequent."  Tr. 16.

The amount and type of treatment a person receives is "an important indicator of the intensity

and persistence" of a claimant's pain.  20 CFR § 416.929(c)(3).  During the relevant time period

(April 2003 to June 15, 2006), Xiong saw Dr. Satterfield, for back pain only three times:

October 2003 (Tr. 149), December 2004 (Tr. 220), and May 2005 (Tr. 214).  There is no

evidence that Xiong saw a physical therapist during this time period.  Previously, Xiong saw

Dr. Satterfield one other time in 2003 (Tr. 165), three times in 2002 (Tr. 160-61, 166-67) and

five times in 2001 (Tr. 163-68).  The primary treatment Dr. Satterfield provided to Xiong at

these appointments was the prescription of pain medication.

The Ninth Circuit has held that "evidence of 'conservative treatment' is sufficient to

discount a claimant's testimony regarding severity of an impairment."  *Parra v. Astrue*, 481 F3d

742, 751 (9th Cir 2007), citing *Johnson*, 60 F3d at 1434.  However, the court has not indicated

what constitutes "conservative treatment."   In *Parra*, 481 F3d at 750-51, the court held that ALJ

properly rejected the claimant's subjective complaints of pain where several objective

examinations showed his knee functioned within normal limits and pain was treated only with

over-the-counter medication.  In *Johnson*, 60 F3d at 1434, the claimant complained of back pain,

among other things, yet went almost three years between treatments for her pain during the

relevant time period.   The court reached a similar conclusion in *Fair v. Bowen*, 885 F2d 597,

604 (9th Cir 1989), where the ALJ discounted the claimant's back pain testimony because the

claimant denied receiving more than "minimal conservative treatment" for his complaints; he

last received physical therapy for his back two years before his hearing; he had not been

hospitalized for evaluation or treatment in four years; he repeatedly failed to heed medical advice

from his physician that he lose weight and exercise; and claimant was capable of caring for all of

his needs.

        In contrast, Xiong's back does not function within normal limits and, according to Xiong

and his son, renders him incapable of caring for all of his needs.  He did not go for years between

medical appointments, but instead sought and received continuous, albeit infrequent, medical

treatment for his back pain and was prescribed appropriate pain medication and, at least prior to

2001, physical therapy.  He did not fail to heed medical advice, other than rejecting steroid

injections in December 2004 and May 2005 which would have only provided temporary relief.

Tr. 214, 220.  In fact, there is no evidence that any other treatment was ever warranted.

Although the treatment ordered by the doctors may have been minimal and conservative given

the MRI and x-ray findings, that fact does not prove that Xiong lied about his the extent of his

chronic pain.  It only proves that nothing more could be done to help him.

### 3.    Inability to Read or Write English

The ALJ appears to have been suspicious of Xiong's claim that he could not speak

English.  Discussing the son's testimony, he reasoned that Xiong must be able to read English

because he "can drive, which requires reading signs in English."  Tr. 19.  That reasoning is

faulty.  It is entirely possible for an illiterate person to find their way and obey traffic rules

without being able to read signs.  Even if Xiong could read a stop sign or recognize the name of

streets that he commonly travels on, this does not contradict his testimony that he cannot speak

and read English.  The ALJ also referred to the fact that Xiong has worked from 1997 through

1999 which "suggests he has some English skills, albeit limited, that allow him to work."  Tr. 17.

The ALJ's conclusion again rests on a faulty premise since one does not necessarily need

English skills, even limited ones, in order to work.  At the hearing, Xiong testified that for his

most recent employment as a janitor in December of 2000, his employer permitted his son to

come to work with him and show him how to do the job.  Tr. 270.  There is no reason to believe

that a similar hand-holding was not used in 1997-1999.  Thus, the only evidence in the record on

this issue undermines the premise relied upon by the ALJ.

Finally, the ALJ pointed out that on March 16, 2001, a physician noted that Xiong's

speech was slurred in his native language which also had made learning English difficult.

Tr. 248.  The ALJ interpreted this to mean that Xiong could have "continu[ed] his consultation in

English except for his slurred speech."  Tr. 18.  However, there is no evidence that Xiong is able

to speak English.  At every medical appointment and even at the hearing before the ALJ, Xiong

relied upon an interpreter to translate.  The record contains no substantial evidence that Xiong

speaks or reads English.  The ALJ erred in relying on these pieces of evidence to discount

Xiong's credibility.

### 4.    <u>Disability Mindset</u>

The ALJ concluded that Xiong "just wants to be off work" and "has a disability mindset

with a desire to stay out of work, as evidenced by his multiple requests to be excused from work,

which also suggests secondary gain."  Tr. 16, 18.  As support, the ALJ noted that Xiong

"apparently had second thoughts after asking Dr. Satterfield to take him completely off work

when he realized he would not be receiving any workers compensation benefits if he were out of

work."  Tr. 18, 244.  However, the portion of the record cited by the ALJ supports the exact

opposite conclusion.  Xiong told Dr. Satterfield that the fact he would not receive workers

compensation was "not a significant issue" and that "[h]e is trying to more so find the cause for

his back pain."  Tr. 244.

There is evidence in the record that Xiong received temporary disability at various times

between 1989 and 1996 while under the care of Dr. Ratanasan in California.  Tr. 204-13.

Dr. Ratanasan variously described the reason for the disability as Bells Palsy, back pain,

headaches and neurosis.  Xiong also received a work release from January 2000 to April 2001

after injuring his back at his job as a janitor.  Tr. 223.  Dr. Satterfield wrote Xiong another note

excusing him from work after her evaluation led her to believe that he was not capable of

working.  Tr. 166, 158.  There is no evidence that Xiong pulled the wool over Dr. Satterfield's

27 - FINDINGS AND RECOMMENDATION

eyes.  Rather, Dr. Satterfield herself was convinced upon examination of Xiong that he was utterly incapable of work as of December 16, 2002.  Tr. 166.

The Commissioner argues, citing *Thomas*, 278 F3d at 959, that a poor work history and lack of propensity to work can be a specific, clear, and convincing reason to discredit Xiong's claimed inability to work.  In *Thomas*, the ALJ found that the claimant had an "extremely poor work history" and "[had] shown little propensity to work in her lifetime."  *Id*.  Xiong's work history does not fit this description.  Although his work history is spotty, each period of unemployment in the record corresponds with a medically diagnosed injury for which he received treatment and work release from a medical professional.

Thus, the record does not support The ALJ's conclusion that Xiong has a "disability mindset" or that he is malingering.

### 5.   **Testimony of Chen Xiong**

It is noteworthy that the statements of Xiong's son, Chen Xiong ("Chen"), fully support The extent of Xiong's limitations.  Although the ALJ found Chen to be "generally credible," he rejected Chen's testimony "to the extent they provide adequate basis in support of limitations beyond my assessment of his [RFC]."  Tr. 19.

The testimony of a family member or other lay person is competent evidence for proving the extent of a claimant's symptoms that "an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  Lewis v. Apfel, 236 F3d 503, 511 (9th Cir 2001); 20 CFR 416.913(d)(4).

On a form filed with the SSA in support of his father's claim, Chen reported that he helps his father with household work, shopping and preparing food everyday.  Tr 112-20.  He described his father's daily activities as "eat breakfast, watch T.V., walking a little bit around the house, eat lunch, watch his childrens or grandchildrens and eat dinner and go to sleep [*sic*]."  He reported that Xiong does not take care of anyone in the house (including children or grandchildren).  Tr. 113.  Xiong is no longer able to hunt, fish or do household work or farm and does not prepare his own meals.  Tr. 113-14.  Chen listed Xiong's condition as affecting his lifting, bending, standing, walking and concentration.  Tr. 117.  He also reports that Xiong cannot lift more than five pounds, bend, or stand for "a long hour" or walk for a long time, which, Chen further explained, meant that his father could only walk for a quarter mile while using a cane before needing to take a two to three hour rest.  *Id*.

The ALJ found Chen's statement that Xiong could watch his children or grandchildren was "ambiguous, as it suggests some level of activity that goes beyond [Xiong's] alleged limitations."  *Id*.  He also stated that there was "no adequate objective basis in support of such limited activities of daily living, or inability to carry any weight, as the claimant's son noted."  *Id*.  He further found Chen's statement that his father could not speak or read English to be suspect because Xiong's ability to drive "requires reading signs in English."  *Id*.

None of these reasons is persuasive.  First, the fact that Xiong may "watch" his grandchildren or children does not necessarily contradict the statement that his is not responsible for their care.  Second, the ALJ is not permitted to reject the statement of a lay witness simply because it is not supported by the medical record.  The purpose of lay witness testimony is to

provide evidence of a claimant's true capabilities where the record is otherwise sparse.  *Smolen*, 80 F3d at 1288-89.  A lack of objective medical evidence is not the same as contradictory medical evidence.  While the latter provides a cogent basis for rejecting lay testimony, the former does not.  *See id*.  Third, as discussed above, the ALJ misinterpreted Xiong's ability to read English.  Because none of the reasons provided by the ALJ actually detract from Chen's observations the ALJ failed to give cogent reasons for finding him less than fully credible.

No objective medical evidence in the record contradicts Chen's observations.  The ALJ's failure to properly address Chen's statements, coupled with the fact that Chen's report of his father's condition accords with the, albeit limited, medical evidence in the record, severely undermines The ALJ's analysis of Xiong's RFC.

### 6.    Conclusion

None of The ALJ's reasons for finding Xiong' report of his symptoms to be less than credible is convincing.  No affirmative medical evidence contradicts Xiong's report of his condition which is strongly supported by his son's testimony.  Therefore, the ALJ erred in assigning Xiong less than full credibility.

## III.    Remand

Because the ALJ erred in rejecting the opinions of Xiong's treating and examining physicians and the subjective pain testimony of Xiong, as well as the testimony of his son Chen, The ALJ's decision was not supported by substantial evidence in the record.

After finding that the ALJ erred, this court has discretion to remand for further proceedings or for immediate payment of benefits.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th

Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen*, 876 F2d 759, 763 (9th Cir 1989). Thus, improperly rejected evidence should be credited as true and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman*, 211 F3d at 1178, citing *Smolen*, 80 F3d at 1292. Where it is not clear the ALJ would be required to award benefits were the improperly rejected evidence credited, the court has discretion whether to credit the evidence. *Connett v. Barnhart,* 340 F3d 871, 876 (9th Cir 2003).

Here remanding for further proceedings are unnecessary. At the administrative hearing, the ALJ presented two hypotheticals to the vocational expert and asked his opinion of Xiong's ability to perform past relevant work based on two different RFCs. The first RFC was that adopted by the ALJ based upon the opinions of the two non-examining physicians. The second was based upon Dr. Ellison's assessment. When asked to determine Xiong's ability to work based upon the latter, the vocational expert responded that the requirements of Xiong's former work, even at the light exertional level, would exceed Xiong's physical capacity. Tr. 273.

Because Xiong is unable to perform his past relevant work, the disability analysis next

proceeds to step five where the Commissioner bears the burden of proving that he can perform a significant number of other jobs in the national economy.  20 CFR §§ 416.920(g), 416.960(c)(2).

At the time of his application, Xiong was an individual approaching advanced age. 20 CFR Pt. 404 Subpt. P, App. 2, § 200.00(g).  As this section states, "where such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains."  *Id*.  According to grid rule number 200.09 based upon Xiong's level of education (none) and previous work experience (unskilled), he is presumptively disabled.  *Id*, § 200.09.

Because no outstanding issues must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find Xiong disabled if all improperly rejected evidence were credited, this case should be remanded for a determination and award of benefits.  *Smolen*, 80 F3d at 1292.

### **RECOMMENDATION**

For the reasons stated above, the decision of the Commissioner should be REVERSED and this case should be REMANDED to the Commissioner for the calculation and payment of benefits pursuant to Sentence Four of 42 USC § 405(g).

///

///

### **SCHEDULING ORDER**

32 - FINDINGS AND RECOMMENDATION

Objections to the Findings and Recommendation, if any, are due **January 10, 2008.**  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 19th day of December, 2007.


_____
Janice M. Stewart
United States Magistrate Judge

33 - FINDINGS AND RECOMMENDATION